# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# SOUTHEASTERN DIVISION

SHARON J. MILBURN,        )
                                    )
       **Plaintiff,**           )
                                    )
   **v.**                          )    **Case number 1:06cv0107 TCM**
                                    )
MICHAEL J. ASTRUE,        )
**Commissioner of Social Security,**[1]  )
                                    )
       **Defendant.**         )

## MEMORANDUM AND ORDER

This 42 U.S.C. § 405(g) action for judicial review of the final decision of Michael J. Astrue, the Commissioner of Social Security ("Commissioner"), denying the applications of Sharon Milburn for disability insurance benefits ("DIB") under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 401-433, and supplemental security income benefits ("SSI") under Title XVI of the Act, 42 U.S.C. §§ 1381-1383b, is before the Court[2] for a final disposition. Ms. Milburn has filed a brief in support of her complaint; the Commissioner has filed a brief in support of his answer.

---

[1]Mr. Astrue was sworn in as the Commissioner of Social Security on February 12, 2007, and is hereby substituted as defendant pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure.

[2]The case is before the undersigned United States Magistrate Judge by written consent of the parties. See 28 U.S.C. § 636(c).

## **Procedural History**

Sharon Milburn ("Plaintiff") filed DIB and SSI applications on July 13, 2004, alleging she was disabled as of October 23, 2000, because of asthma, chronic obstructive pulmonary disease ("COPD"), back pain, and attention deficit hyperactivity disorder ("ADHD").[3] (R. at 41-45, 81-83.)[4] Her applications were denied initially and after a hearing held in January 2006 before Administrative Law Judge ("ALJ") Julian Cosentino. (Id. at 8-21, 33-37, 46, 63-67, 260-82.) The Appeals Council then denied Plaintiff's request for review, thereby adopting the ALJ's decision as the final decision of the Commissioner. (Id. at 2-4.)

## **Testimony Before the ALJ**

Plaintiff, represented by counsel, and Jeffrey F. Magrowski, Ph.D., testified at the administrative hearing.

Plaintiff testified she was born on July 30, 1966, and was then 39 years' old. (Id. at 263.) She was 5 feet 2 inches tall and weighed 165 pounds. (Id. at 264.) She was right-handed. (Id.) She had finished the tenth grade and had been in special education classes for

---

[3]The applications did not originally cite ADHD as an impairment. Plaintiff testified that she was diagnosed with this condition six months before the hearing.

[4]References to "R." are to the administrative record filed by the Commissioner with his answer.

reading and comprehension.  (Id. at 263-64.)  She was married and lived with her husband and three sons.[5]  (Id. at 267.)  Her husband was retired.[6]  (Id.)

Plaintiff worked for one day in 2000, in home health care.  (Id. at 264.)  Before that, she was last employed on the assembly line of an electrical manufacturing company.  (Id.)  She had worked for that company for a year, had quit, and then had returned.  (Id.)  She had also worked at a nursing home for approximately three and one-half years doing laundry, housekeeping, and kitchen work.  (Id. at 265.)  She had to quit that job because of breathing problems and back pain.  (Id.)  She stopped working for the manufacturing company because the factory had shut down and because of her breathing problems.  (Id.)

Plaintiff described her primary health problems as emphysema, asthma, and back pain.  (Id.)  These were her only current problems.  (Id.)  She had stopped going to a doctor because she had no insurance.  (Id.)  She was still using two or three types of inhalers, taking breathing treatments four times a day, and using a continuous nocturnal administration of positive airway pressure ("CPAP") machine at night.  (Id. at 266.)  When she worked at the nursing home, she had had to go to the hospital twice for her breathing problems.  (Id.)

Her breathing problems were getting worse.  (Id. at 267.)

Plaintiff's sister comes in and does the majority of her housework, e.g., the dusting and vacuuming.  (Id. at 268.)  She and her husband work together to prepare meals and do

_____

[5]Her sons were by her first marriage, which ended in 1994.  At the time of the filing of her applications, only two were under the age of 19 years.  (Id. at 82.)

[6]Plaintiff and her husband were married in December 2001.  (Id. at 81.)

- 3 -

the grocery shopping.  (Id. at 268, 269.)  She cannot do the laundry because of the stooping and bending – she runs out of breath.  (Id. at 268.)  The only chore she regularly does is the dishes.  (Id. at 277.)  Even so, she can only stand for ten minutes without having to sit down before resuming this chore.  (Id.)

She drives, but not very far because of her sleep apnea.  (Id. at 269.)  When she goes grocery shopping, she cannot stay long because of her breathing problems.  (Id.)  Her back hurts when she is shopping if she has to do a lot of bending and stooping.  (Id. at 270.)  Her husband helps her get out of the bath.  (Id. at 276.)  She and her husband occasionally visit his parents, but, with the exception of her sisters, she does not socialize with anyone else.  (Id. at 270.)  She does not belong to any organizations or participate in any group activities.  (Id.)  During the day, she watches televison, talks on the telephone to one of her sisters, and sometimes does puzzles.  (Id. at 270, 277.)  Because of her comprehension problems, her only reading is the newspaper.  (Id. at 271.)

Plaintiff takes medication for high blood pressure, breathing problems, back pain, and ADHD.  (Id. at 271-73.)  The ADHD medication helps her concentrate.  (Id. at 273.)

Plaintiff explained that she has pain in her hands, feet, legs, and lower back.  (Id.)  Her hands go numb, and her back hurts if she sits for long or does a lot of bending and stooping.  (Id.)  Her back pain was currently a six on a scale of one to ten, with ten being the worst.  (Id. at 274.)  She has had this back pain for four years.  (Id.)  The pain in her hands, arms, and feet is a seven.  (Id.)  This pain she has also had for four years.  (Id.)  Sometimes, the pain comes and goes and sometimes it is constant.  (Id.)  The pain and her breathing

problems keep Plaintiff from working.  (Id. at 275.)  The latter are the worst.  (Id.)  These

problems are worse in the summer and are also aggravated by perfumes, dust, lint, and odd

odors.  (Id.)

Also, Plaintiff has problems going up and down stairs.  (Id. at 277.)  She can climb

up only five or six steps before having to rest.  (Id. at 278.)  Her sleep apnea causes her to

fall asleep, instantly, during the day.  (Id. at 280-81.)  She has difficulty concentrating.  (Id.

at 281.)

Plaintiff does not see a mental health professional.  (Id.)

Dr. Magrowski testified as a vocational expert ("VE").  (Id.)  He was asked by the

ALJ to assume the following hypothetical individual.

> . . . [S]he was restricted to light work exertionally.  She could not lift anything
> over 20 pounds.  Frequently she could lift up to ten pounds.  Could be on her
> feet six hours out of an eight-hour day, if not the full time during an eight-hour
> day.  But had to be in environments that were free of dust, fumes, relatively
> non-polluted environments and were not exposed to temperature extremes.
> Are there jobs that could be done within that range of limitations by somebody
> her age with the work background and the educational level she's had?

(Id. at 278-79.)

The VE replied that this person could perform some unskilled or lower semi-skilled

work.  (Id. at 279.)  For instance, she could perform such jobs as an order clerk in the food

and beverage industry, parking lot attendant, some cashiering jobs, and some video monitor

or surveillance system monitors.  (Id.)  These jobs existed in sufficient numbers in the state

and national economies and were simple jobs, requiring no more than two-step instructions.

(Id.)  If, however, the individual needed to frequently change positions due to her back pain,

could not leave her house in certain weather, had to leave the job when breathing problems arose, or could not focus due to sleeping problems, there were no jobs that this individual could perform.  (Id. at 279-80.)

## Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms Plaintiff completed as part of the application process, documents generated pursuant to her applications, records from various health care providers, and evaluation reports.

On a form asking Plaintiff to describe her daily activities, she explained that, in a thirty-day period, she has no good days, has ten fair days, and has twenty bad days.  (Id. at 93, 227.)  The fair days are not in a row; rather, they are interspersed with bad days.  (Id. at 93.)  She does not leave the house during the hot and humid weather or in cold weather.  (Id. at 94.)  She is worse now than she was a year ago.  (Id.)  She used to be able to walk to the mailbox 120 yards from the house, but now she has to stop four times.  (Id.)  Her breathing problems interfere with finishing tasks.  (Id.)  She does not eat breakfast and has a sandwich for lunch.  (Id. at 95.)  Because of her breathing problems, she no longer goes fishing or camping.  (Id.)  If she lifts anything, she gets chest pains.  (Id. at 96.)  If she lifts too much, she gets back pains.  (Id.)  Also, she has a hard time remembering things unless they are written down and she cannot finish what she starts.  (Id.)

Plaintiff reported on another form that her impairments first bothered her in the 1990's.  (Id. at 158.)  They stopped her from working on October 23, 2000.  (Id.)  She had

tried to return to work, but was able to do so for only one day in 2003 before having to stop again.  (Id.)

Plaintiff also explained, on a separate function report, that she sometimes forgets to take her medication.  (Id. at 110.)  Because of her impairments, it is hard for her to lift, bend, stand, walk, and climb stairs.  (Id. at 113.)  The farthest she can walk is fifty yards, then she has to rest for five minutes.  (Id.)  She follows instructions and gets along with people in authority fairly well.  (Id. at 113-14.)

Plaintiff had reported annual earnings in the years 1995 through 2000, inclusive, and $117.76 in 2003.  (Id. at 72.)  Her highest annual earnings were $9,546.53, in 1999.  (Id.)

On a form completed after the initial denial of her applications, Plaintiff reported that her breathing had gotten worse.  (Id. at 98.)  She had started seeing Dr. Dennis Daniels in September 2004.  (Id. at 99.)  On another form, Plaintiff listed her recent medical treatment.  (Id. at 87.)  In addition to seeing Dr. Daniels in September, she had seen Dr. Davis from September 20, 2004, to October 4, 2005; Dr. Wood from October 6, 2004, to November 2, 2004; Dr. Bhatt[7] on August 22, 2005; and Dorothy Walker[8] from October 21, 2004, to present.  (Id.)

The medical records before the ALJ begin with those of the Samuel Medical Clinic and are primarily of Plaintiff's monthly visits to Dr. Davis.

---

[7]There are no records from Dr. Bhatt in the administrative record.

[8]Dorothy Walker was a family nurse practitioner who worked with Dr. Davis.

Plaintiff's records from the Samuel Medical Clinic are from June 1998 to January 2004. (<u>Id.</u> at 255-59.) Plaintiff went to the Clinic in June 1998 for her annual exam. (<u>Id.</u> at 255.) She had no health problems. (<u>Id.</u>) She had a sore throat and sinus problems when she next went to the Clinic. (<u>Id.</u>) In October, she had a physical for work. (<u>Id.</u>) She was doing well, and had no chest pain, shortness of breath, or back pain. (<u>Id.</u>) She next went to the Clinic in April 2001 for a sore throat. (<u>Id.</u>) The diagnosis was an acute respiratory infection. (<u>Id.</u>) In March 2002, she again had a sore throat. (<u>Id.</u>) The diagnosis was the same. (<u>Id.</u>) In September, Plaintiff consulted the physicians at the Clinic for an ear infection and vomiting. (<u>Id.</u> at 256.) Seven days later, she felt better. (<u>Id.</u>)

In January 2003, Plaintiff complained of shortness of breath and increased blood pressure. (<u>Id.</u> at 257.) On a pulmonary function test in June, her forced vital capacity ("FVC") values ranged from 2.07 to 2.07, 60% of expected, and her forced expiratory volume ("FEV") values ranged from 1.69 to 1.72. (<u>Id.</u> at 198.) These values were indicative of a moderate restriction. (<u>Id.</u> at 198.) In September, she went to the Clinic for vomiting, diarrhea, and sinus congestion. (<u>Id.</u> at 257.) In November, Plaintiff had the chills, nausea, and a sore throat. (<u>Id.</u>) This sore throat persisted in January 2004. (<u>Id.</u> at 258.) She could not swallow and had a cough. (<u>Id.</u>)

The earliest record of Dr. Davis is in May 2004 when Plaintiff consulted him about her breathing problems for the past several years. (<u>Id.</u> at 245.) He noted that she had had a smoking habit of twenty packs a year but had quit. (<u>Id.</u>) His diagnosis was COPD, hypertension, and low back pain. (<u>Id.</u>) X-rays of her lumbar spine showed mild scoliosis

and postoperative changes in the pelvis.  (<u>Id.</u> at 247.)  X-rays of her chest showed no infiltrates or effusions, but did reveal "[p]robable calcifications from old granulomatous disease involving the right lower lung field."  (<u>Id.</u> at 248.)  A magnetic resonance imaging ("MRI") scan of her lumbar spine revealed no significant bulging or herniated disc.  (<u>Id.</u> at 246.)  Two days later, Dr. Davis reviewed these findings with Plaintiff.  (<u>Id.</u> at 244.)

Plaintiff consulted Dr. Davis in July for back pain and breathing problems.  (<u>Id.</u> at 223, 243.)  Her diagnosis was COPD and poison ivy.  (<u>Id.</u>)  Plaintiff was scheduled for an evaluation by a pulmonary specialist.  (<u>Id.</u> at 222, 242.)  The next month, Plaintiff was treated by Dr. Davis for an ear infection.  (<u>Id.</u> at 221, 241.)  In September, she complained of back pain and was prescribed a pain reliever, Ultram, in addition to her asthma medication.  (<u>Id.</u> at 220.)

Also in September, Plaintiff was valuated by the pulmonary specialist, Dennis Daniels, M.D.  (<u>Id.</u> at 234-37.)  Plaintiff informed Dr. Daniels that she began to have increasing dyspnea, shortness of breath, on exertion six years ago.  (<u>Id.</u> at 234.) She stopped smoking three and one-half years ago.  (<u>Id.</u>)  She denied any recurrent pneumonias, productive cough, symptoms of sinusitis, or reflux disease.  (<u>Id.</u>)  A recent chest x-ray had revealed a lung nodule in the base of her right lung.  (<u>Id.</u>)  Currently, she had chronic low back pain.  (<u>Id.</u>)  Her husband told her she snored.  (<u>Id.</u>)  Because of the decreased activity caused by the dyspnea and sleepiness, she had gained weight.  (<u>Id.</u>)  "She had an Epworth

score[9] of 16 out of 24, consistent with excessive daytime hypersomnolence." (Id.) A pulmonary function test indicated FVC values ranging from 2.19 to 2.66, 77% of what was expected, and FEV values from 1.77 to 1.94, 68% of what was expected. (Id. at 224.) These values indicated a mild obstruction and low vital capacity, possibly due to restriction. (Id.) On examination, she weighed 177 pounds. (Id. at 235.) Her saturation at rest was 95%, and after a short, brisk walk was 92%. (Id.) Her respiratory and heart rates increased, and her face was flushed. (Id.) Dr. Daniels' assessment was emphysema, obesity, deconditioning, dyspnea, sleep abnormality, not otherwise specified, and lung nodule. (Id.) She was to be scheduled for a computed tomography ("CT") scan of her chest to evaluate the lung nodule and the lung for emphysema. (Id.)

Plaintiff complained to Dr. Davis of a cough and sore throat in October. (Id. at 197.) She was diagnosed with otitis media, sinusitis, and sleep disturbance and was to be scheduled for a sleep study. (Id.) She had a normal gait, and no decrease in her range of motion. (Id.) The next month, Plaintiff consulted Dr. Davis to review the report from Dr. Wood, see pages 12 to 14 below. (Id. at 196.) Her only diagnosis was adult ADHD. (Id.) She was to start Strattera, a medication used to treat ADHD. (Id.)

---

[9]The Epworth Sleepiness Scales is a series of short questions used to diagnose narcolepsy, "a chronic sleep disorder characterized by overwhelming daytime drowsiness and sudden attacks of sleep." Mayo Clinic, http://www.mayoclinic.com/health/narcolepsy (last visited Sept. 18, 2007). Sleep apnea can also cause excessive daytime sleepiness. Id.

Two weeks later, Plaintiff underwent a sleep study by Dr. Daniels. (Id. at 201.) She was found to have mild obstructive sleep apnea. (Id.) The cardiac analysis was negative for any contributing factor. (Id.) A CPAP machine was recommended. (Id.)

Plaintiff reported to Dr. Davis at her next visit, in December, that she had stopped taking the Strattera because it had caused constipation. (Id. at 195.) The diagnosis was sleep apnea. (Id.)

Plaintiff complained at her January 2005 visit to Dr. Davis of a sore throat. (Id. at 194.) She was still not taking the Strattera. (Id.) Her diagnosis was attention deficit disorder ("ADD") and pharyngitis (an inflammation of the mucous membrane and pharynx). (Id.) The same month, Plaintiff underwent another sleep study to determine the proper titration of her CPAP machine. (Id. at 190.) It was recommended that she have another in three to six months to help her control her daytime sleepiness. (Id.) If it did not, then she was to be referred to a sleep medicine physician. (Id.) It was also recommended that she reduce her weight. (Id.)

Plaintiff reported to Dr. Davis in February that she had had the flu the past week but was doing better. (Id. at 183.) The next month, she was losing weight. (Id. at 182.) She had stopped drinking a twelve-pack of Coke daily and was drinking diet soda. (Id.) She had not yet received her CPAP machine, and she wanted to quit the medication for her COPD, Spiriva. (Id.) Another medication, Adderall, replaced the Strattera for her ADHD.[10] (Id.)

---

[10]Adderall is also prescribed for the treatment of narcolepsy. See Drug Information Online, http://www.drugs.com/search.php? (last visited Sept. 18, 2007). There is no indication in the record that Plaintiff was ever diagnosed with narcolepsy.

Her diagnosis was adult ADD, asthma, and hypertension. (<u>Id.</u>) In April, Plaintiff complained of low back pain. (<u>Id.</u> at 181.) She walked with a normal gait. (<u>Id.</u>) Her impairments were fatigue, ADD, and hypertension. (<u>Id.</u>) Blood work indicated that her potassium levels were low and her glucose was high. (<u>Id.</u> at 185.)

The records of Dr. Davis for the following month, May, read that Plaintiff consulted him for a check up for ADD and trouble sleeping. (<u>Id.</u> at 180, 184.) Her current impairments were hypokalemia (low potassium in the blood), ADD, insomnia, and obstructive sleep apnea. (<u>Id.</u> at 180.) She was alert and oriented to person, place, and time; her gait was normal. (<u>Id.</u>)

On June 10, Plaintiff consulted Dr. Davis for a refill of her medications and about her trouble breathing and sleeping. (<u>Id.</u> at 165.) The diagnosis was asthma, adult ADD, and obstructive sleep apnea. (<u>Id.</u>) The next month, Plaintiff reported that she had had an episode of chest pain the previous week. (<u>Id.</u> at 166.) Chest pain was added to her list of impairments. (<u>Id.</u>) An echocardiogram revealed a "[t]race of pulmonary insufficiency" and "[r]eversal of the E to A ratio of the mitral valve probably due to diastolic dysfunction." (<u>Id.</u> at 168.) A myocardial perfusion scan revealed "[a]nterior ischemia," probably due to breast attenuation. (<u>Id.</u> at 169.)

Also before the ALJ was a report of John O. Wood, Psy. D., a clinical psychologist who evaluated Plaintiff at the request of her attorney. (<u>Id.</u> at 212-17.) Plaintiff informed Dr. Wood that she was one of sixteen children born to her mother, who had a drinking problem, and was placed in foster care at the age of seven. (<u>Id.</u> at 213.) She returned home at the age

of 17 when her mother remarried; also at that age, she became pregnant and married.  (Id.)

She had been married three times.  (Id.)  She lived with her third husband, who she married

in 2001.  (Id.)  She was now a stay-at-home housewife.  (Id.)  She did the cooking, cleaning,

and household shopping, and spend time with her husband.  (Id.)  She further informed Dr.

Wood that she had problems with inattention and concentration and had a history of

problems with learning.  (Id. at 212.)  She also had physical problems of high blood pressure,

back pain, and sinus problems.  (Id.)  Her current medications included Singulair for her

asthma, Combivent, an inhaler for her asthma, and Spiriva for her COPD.  (Id.)  She reported

that her sleep was good, and she had no additional mental health problems.  (Id.)  She also

reported that she did not like the job in home health because of the traveling and that she

cooked, cleaned, and did the household shopping.  (Id. at 213.)  She was given an ADD

checklist and, a few days later, the TOVA (Tests of Variables of Attention).  (Id. at 214.)

The results indicated difficulties with maintaining attention and concentration.  (Id.)  Dr.

Wood diagnosed Plaintiff with ADHD, not otherwise specified, and learning disorder, not

otherwise specified.  (Id.)  He assessed her Global Assessment of Functioning as 70.[11]  (Id.)

---

[11]"According to the [Diagnostic Manual], the Global Assessment of Functioning Scale is used
to report 'the clinician's judgment of the individual's overall level of functioning.'"  **Hudson v.
Barnhart**, 345 F.3d 661, 663 n. 2 (8th Cir. 2003).  See also  **Bridges v. Massanari**, 2001 WL
883218, *5 n.1 (E.D. La. July 30, 2001) ("The GAF orders the evaluating physician to consider
psychological, social, and occupational functioning on a hypothetical continuum of mental health-
illness." (interim quotations omitted)).  A GAF score between 61 and 70 indicates "[s]ome mild
symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or
school functioning (e.g., occasional truancy, or theft within the household), but generally functioning
pretty well, has some meaningful interpersonal relationships." Diagnostic Manual at 34 (alteration
added).

Dr. Wood also completed a Medical Source Statement – Mental on behalf of Plaintiff. (Id. at 216-17.)  Of twenty listed mental activities, Plaintiff was rated as "moderately limited" in four:  her "ability to understand and remember detailed instructions"; her "ability to carry out detailed instructions"; her "ability to work in coordination with or proximity to others without being distracted by them"; and her "ability to complete a normal workday and workweek without interruptions from psychologically based symptoms . . . ."  (Id. at 216-17.)  She was markedly limited in one, the "ability to maintain attention and concentration for extended periods," and extremely limited in none.  (Id.)  She was not significantly limited in the remaining fifteen activities.  (Id.)

Dr. Wood later recommended to Ms. Walker, see note 8, supra, that Plaintiff be placed on a trial medication for ADHD.  (Id. at 202.)  Subsequently, she was prescribed Strattera.  (Id. at 196.)

In August 2004, Peter S. Moran, D.O., a psychiatrist, completed a Psychiatric Review Technique Form ("PRTF") for Plaintiff.  (Id. at 131-44.)  He concluded that Plaintiff did not have a medically determinable mental impairment.  (Id.)

The same month, an agency counselor completed a Physical Residual Functional Capacity Assessment of Plaintiff, listing her primary diagnosis as COPD, her secondary diagnosis as hypertension, and other impairments as low back pain.  (Id. at 145.)  Citing Plaintiff's medical records to date, the counselor concluded that these impairments resulted in a capacity to occasionally lift twenty pounds; frequently lift ten pounds; stand, walk, or sit for six hours in an eight-hour work; and an unlimited ability to push or pull.  (Id. at 146.)

She had no postural, manipulative, communicative, or visual limitations. (Id. at 148-50.) She had one environmental limitation – a need to avoid concentrated exposure to such pollutants as fumes, odors, dusts, and gases, and to avoid areas with poor ventilation. (Id. at 50.)

### The ALJ's Decision

Following the five-step evaluation process employed by the Commissioner, see pages 17 to 20, below, the ALJ first noted that Plaintiff had not engaged in substantial gainful activity since her allege disability onset date. (Id. at 13.) He next summarized the medical evidence and determined that Plaintiff had severe impairments of asthma, COPD, degenerative joint disease with back and joint pain, obstructive sleep apnea, and ADHD. (Id. at 15-16.) These impairments were not, however, either singly or in combination, of Listing-level severity. (Id. at 16.)

The ALJ then addressed the third step in the evaluation process, Plaintiff's residual functional capacity ("RFC"). In doing so, he evaluated her credibility, noting, inter alia, that (a) there were no opinions that she was unable to work; (b) the pulmonary function tests indicated no more than a moderate obstruction and she did not follow up with the resulting referrals to specialists about her sleep apnea; (c) she testified that the CPAP machine helps her sleep apnea and she does not follow up with any treatment; (d) the objective evidence does not support the degree of impairments she describes because of her breathing difficulties or back pain; (e) her attention improved with medication; (f) her ADHD was present when she was working and there was no indication that it had deteriorated or

worsened; (g) she continued to smoke for awhile after she stopped working because of breathing problems; and (h) she married after she stopped working, her husband was retired, and the record indicated that she had been a full-time housewife since then, "suggest[ing] that there may be reasons other than disability why she stopped working." (Id. at 16-18.) The ALJ concluded that Plaintiff had the RFC to perform work at the light exertional level requiring simple one-step or two-step instructions and does not require exposure to pollutants and temperature extremes. (Id. at 18.)

As required at step four, the ALJ next assessed whether Plaintiff could perform her past relevant work with this RFC. (Id.) She could not. Proceeding to step five, he determined that she could, according to the VE's testimony, perform other jobs that exist in significant numbers in the state and national economies. (Id.) She was not, therefore, disabled within the meaning of the Act. (Id. at 20.)

## Legal Standards

Under the Social Security Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. § 1382c(a)(3)(A). The impairment suffered must be "of such severity that [the claimant] is not only unable to do [her] previous work, but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B) (alterations added).

The Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. § 404.1520.  See also **Johnson v. Barnhart**, 390 F.3d 1067, 1070 (8th Cir. 2004); **Ramirez v. Barnhart**, 292 F.3d 576, 580 (8th Cir. 2002); **Pearsall v. Massanari**, 274 F.3d 1211, 1217 (8th Cir. 2002).  First, the claimant cannot be presently engaged in "substantial gainful activity."  See 20 C.F.R. § 404.1520(b).  Second, the claimant must have a severe impairment.  See 20 C.F.R. § 404.1520(c).  The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . ." Id. (alteration added).  "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work."  **Caviness v. Massanari**, 250 F.3d 603, 605 (8th Cir. 2001).

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement.  See 20 C.F.R. § 404.1520(d), and Part 404, Subpart P, Appendix 1.  If the claimant meets these requirements, she is presumed to be disabled and is entitled to benefits. **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

At the fourth step in the process, the ALJ "review[s] [claimant's] residual functional capacity and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. §§ 404.1520(e) and 416.920(e) (alterations added).  "[RFC] is what the claimant

is able to do despite limitations caused by all the claimant's impairments." **Lowe v. Apfel**, 226 F.3d 969, 972 (8th Cir. 2000) (citing 20 C.F.R. § 404.1545(a)) (alteration added). "[RFC] 'is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'" **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (quoting McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc)) (alteration added). Moreover, "[RFC] is a determination based upon all the record evidence[,]" not only medical evidence. **Dykes v. Apfel**, 223 F.3d 865, 866-67 (8th Cir. 2000) (alterations added). Some medical evidence must be included in the record to support an ALJ's RFC holding. **Id.** at 867. "The need for medical evidence, however, does not require the [Commissioner] to produce additional evidence not already within the record. '[A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision.'" **Howard v. Massanari**, 255 F.3d 577, 581 (8th Cir. 2001) (quoting Frankl v. Shalala, 47 F.3d 935, 937-38 (8th Cir. 1995)) (alterations in original).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. **Ramirez**, 292 F.3d at 580-81; **Pearsall**, 274 F.3d at 1217. This evaluation requires that the ALJ consider "(1) a claimant's daily activities, (2) the duration, frequency, and intensity of pain, (3) precipitating and aggravating factors, (4) dosage, effectiveness, and side effects of medication, and (5) residual functions." **Ramirez**, 292 F.3d at 581 (citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted)). Although an

ALJ may not disregard subjective complaints of pain based only on a lack of objective medical evidence fully supporting such complaints, "an ALJ is entitled to make a factual determination that a Claimant's subjective pain complaints are not credible in light of objective medical evidence to the contrary." **Id.** See also **McKinney v. Apfel**, 228 F.3d 860, 864 (8th Cir. 2000) ("An ALJ may undertake a credibility analysis when the medical evidence regarding a claimant's disability is inconsistent.").  After considering the Polaski factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).

The burden at step four remains with the claimant.  See **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001); **Singh**, 222 F.3d at 451.  "It is the claimant's burden, and not the Social Security Commissioner's burden, to prove the claimant's RFC." **Pearsall**, 274 F.3d at 1217.

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Banks**, 258 F.3d at 824.  See also 20 C.F.R. § 404.1520(f).  The Commissioner may meet his burden by referring to the medical-vocational guidelines (the "Grid") or by eliciting testimony by a vocational expert. **Pearsall**, 274 F.3d at 1219.  The Grid may not be relied on if the claimant suffers from non-exertional impairments unless those

impairments "do not diminish or significantly limit the claimant's [RFC] to perform the full range of Guideline-listed activities[.]" **Ellis v. Barnhart**, 392 F.3d 988, 996 (8th Cir. 2005) (alterations added; interim quotations omitted).

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court if it is supported by "substantial evidence on the record as a whole." **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001); **Clark v. Apfel**, 141 F.3d 1253, 1255 (8th Cir. 1998); **Frankl**, 47 F.3d at 937. "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the decision." **Strongson v. Barnhart**, 361 F.3d 1066, 1069-70 (8th Cir. 2004) (interim quotations omitted). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the court must also take into account whatever in the record fairly detracts from that decision. **Warburton v. Apfel**, 188 F.3d 1047, 1050 (8th Cir. 1999); **Baker v. Apfel**, 159 F.3d 1140, 1144 (8th Cir. 1998). The court may not reverse that decision merely substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it "might have decided the case differently." **Strongson**, 361 F.3d at 1070. Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, the [Court] must affirm the agency's decision." **Wheeler v. Apfel**, 244 F.3d 891, 894-95 (8th Cir. 2000) (alteration added).

## Discussion

Plaintiff argues that the ALJ's decision is not supported by substantial evidence on the record as a whole.[12]  The Commissioner disagrees.

In support of her argument, Plaintiff cites the criteria for disability due to impaired pulmonary functioning.  Listing 3.02, 20 C.F.R. Pt. 404, Subpt. P, App. 1, defines the criteria for disability due to chronic pulmonary insufficiency.  For a person of Plaintiff's height, 62 inches, the FEV value must be equal to or *less* than 1.05.  Plaintiff's never was.  For a person of Plaintiff's height, the FVC value must be equal to or *less* than 1.25.  Plaintiff's never was.[13]

Although Plaintiff's pulmonary function tests do not satisfy Listing 3.02's criteria, if Plaintiff's testimony were found to be credible, as Plaintiff argues it should have been, she would be found disabled based on her dyspnea, COPD, asthma, ADHD, and obstructive sleep apnea.

When assessing Plaintiff's credibility, the ALJ properly considered the lack of any restrictions placed on her by her physicians and the lack of objective medical evidence supporting the degree of limitations caused by her alleged impairments.  See **Raney v.**

_____

[12]Plaintiff's brief includes several errors which do not affect the weight of her arguments.  For instance, she states that the ALJ found her asthma and COPD to be mild impairments.  He found these, and her degenerative joint disease, obstructive sleep apnea, and ADHD, to be severe.  She states that the ALJ concluded his analysis at step four.  He did not.  Rather, he found at step four that she could not return to her past relevant work and then proceeded to analyze at step five whether there was other work she could perform.

[13]Plaintiff also argues that the ALJ improperly failed to consider the effect of her obesity on her respiratory system as required by Listing 3.00(I).  20 C.F.R. Pt. 404, Subpt. P, App. 1.  Although "[t]he combined effects of obesity with respiratory impairments can be greater than the effects of each of the impairments considered separately," id., there is no indication in the record that her respiratory impairments and obesity combined to create a disabling impairment.

**Barnhart**, 396 F.3d 1007, 1011 (8th Cir. 2005) (affirming adverse credibility determination by ALJ who emphasized absence of any doctor's opinion that claimant was disabled); **Tucker v. Barnhart**, 363 F.3d 781, 783 (8th Cir. 2004) (finding that ALJ properly questioned credibility determination of claimant whose medical records showed relatively minor degenerative changes and whose physicians did not place any restrictions on him despite allegations of severe pain); **Depover v. Barnhart**, 349 F.3d 563, 567 (8th Cir. 2003) (affirming adverse credibility finding based in part on lack of any opinion by claimant's treating physicians that claimant was disabled). Other proper considerations were her testimony that the CPAP machine helped her sleep apnea and medication helped her ADHD, see **Guilliams v. Barnhart**, 393 F.3d 798, 802 (8th Cir. 2005) ("Evidence of effective [treatment and] medication resulting in relief . . . may diminish the credibility of a claimant's complaints.") (alterations added), and her failure to follow up on Dr. Daniels' suggestion that the CPAP machine be retitrated if it did not give Plaintiff the sought-for benefits or that she be referred to a sleep medicine physician if her sleep apnea did not improve. See **Ostronski v. Chater**, 94 F.3d 413, 419 (8th Cir. 1996) (holding that a failure to seek consistent medical treatment weighed against credibility of complaints of disabling pain and functional limitations).

Plaintiff argues that any failure to follow-up on treatment was due to a lack of insurance. Although a lack of funds for treatment may be relevant to a disability determination, see **Clark v. Shalala**, 28 F.3d 828, 831 n.4 (8th Cir. 1994), with the exception of her testimony that she had to pay for the CPAP machine because Medicaid

would not, there is no evidence in the record that Plaintiff attempted to obtain low cost medical treatment and was rejected or that she had been denied medical care because of her financial situation. See **Riggins v. Apfel**, 177 F.3d 689, 693 (8th Cir. 1999) (rejecting claim of claimant that he could not afford medication; there was no evidence that he had sought treatment offered to indigents or that he stopped smoking in order to pay for medication); **Clark**, 28 F.3d at 831 n.4 (rejecting claim that claimant lacked financial resources to pursue more aggressive medical treatment; "claimant offered no testimony or other evidence" that she had been denied pain medication because of financial constraints); **Murphy v. Sullivan**, 953 F.2d 383, 386-87 (8th Cir. 1992) (similar holding). Indeed, although Plaintiff alleged a disability onset date of October 2000, her medical records are sporadic until April 2001, when her only complaint was of a sore throat. There is no allegation that she lacked funds or insurance during this period.

The ALJ also did not err in considering that Plaintiff worked with ADHD. See **Goff v. Barnhart**, 421 F.3d 785, 793 (8th Cir. 2005) (finding that impairment was not as severe as alleged by claimant because claimant had effectively worked with that impairment and there was no evidence that impairment had since deteriorated). The Court also notes that Plaintiff reported on a form that her impairments had begun to bother her in the 1990's, yet her highest annual earnings were in 1999, the year before her alleged disability onset date.

Although Plaintiff testified that she was unable to work because of her impairments, the ALJ properly discounted this testimony based, in part, on Plaintiff's report to Dr. Wood that her husband, who she had married after she stopped working, was retired and that she

had a been a full-time housewife since her marriage. She also reported to Dr. Wood that she had no problem sleeping. Such inconsistencies are a proper consideration when evaluating a claimant's credibility. See **Tellez v. Barnhart**, 403 F.3d 953, 957 (8th Cir. 2005) (deferring to ALJ's credibility determination in case in which claimant gave inconsistent information to physicians and other health care providers); **Holmstrom v. Massanari**, 270 F.3d 715, 721-22 (8th Cir. 2001) (affirming adverse credibility determination based on inconsistencies between what claimant told doctor and hearing testimony). Another inconsistency is between her alleged disability onset date of October 2000 and the most recent medical record before that date, in October 1998, reporting that she was doing well and had no chest pain, shortness of breath, or back pain. The medical record after that date, in April 2001, reports only a complaint of a sore throat. Additionally, there is evidence in the record that Plaintiff stopped working at the factory because it shut down and as a home health worker because she did not like the traveling. "Courts have found it relevant to credibility when a claimant leaves work for reasons other than her medical condition." **Goff**, 421 F.3d at 793. See also **Johnson v. Apfel**, 240 F.3d 1145, 1147 (8th Cir. 2001) (affirming adverse credibility based on, inter alia, claimant stopping work because his position was eliminated and not for a medical reason).

After assessing Plaintiff's RFC, the ALJ asked the VE a hypothetical question. "A hypothetical question is properly formulated if it sets forth impairments 'supported by substantial evidence in the record and accepted as true by the ALJ.'" **Guilliams v. Barnhart**, 393 F.3d 798, 804 (8th Cir. 2005) (quoting Davis v. Apfel, 293 F.3d 962, 966 (8th Cir.

2001)).  Any alleged impairments properly rejected by an ALJ as untrue or unsubstantiated need not be included in a hypothetical question.  **Johnson**, 240 F.3d at 1148.

In the instant case, the ALJ included only those limitations he found supported by the record.  The VE's unrefuted testimony is that there are jobs existing in significant numbers in the state and national economies that an individual with those limitations could perform.

### Conclusion

The question is not how this Court would decide whether Plaintiff is disabled within the meaning of the Act, but is whether the ALJ's decision that she is not is supported by substantial evidence in the record as a whole, including a consideration of the evidence that detracts from the ALJ's decision.  For the reasons discussed above, there is such evidence.  Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is AFFIRMED and that this case is DISMISSED.

An appropriate Judgment shall accompany this Memorandum and Order.


/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this 18th day of September, 2007.